IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| G&G CLOSED CIRCUIT EVENTS, LLC,<br>*Plaintiff* | §<br>§<br>§ | |
| | § | SA-20-CV-01094-XR |
| -vs- | §<br>§ | |
| ALAMO CARD HOUSE, LLC AND<br>VALARIE M. HOWARD,<br>*Defendants* | §<br>§<br>§<br>§ | |

**ORDER**

On this date, the Court considered Plaintiff G&G Closed Circuit Events, LLC's motion for summary judgment (ECF No. 15). After careful consideration, the Court GRANTS Plaintiff's motion for summary judgment against Defendant Valerie M. Howard.

**BACKGROUND**[1]

Plaintiff held exclusive commercial distribution rights to the broadcast of the Gennady Golovkin v. Saul Alvarez telecast (the "Event") nationwide on September 16, 2017. ECF No. 15-1, Ex. A-1 (Copyright Assignment Agreement). The Event broadcast originated via satellite and was electronically coded or "scrambled" before being retransmitted to cable systems and satellite television companies via satellite signal. ECF No. 1 at 4.

Plaintiff entered into agreements with various commercial establishments in Texas that allowed them, for a fee, to exhibit the Event to their patrons. *Id.* at 3. The sublicense fee for the Event was based on the capacity of the establishment. For example, if a commercial establishment had a maximum fire code occupancy of 200 persons, the commercial sublicense fee for the Event would have been $5,000.00. ECF No. 15-1, Ex. A (Aff. of Thomas P. Riley) ¶ 7; *id.*, Ex. A-3 (Rate Card).

---

[1] The following facts are undisputed unless otherwise noted.

In order to safeguard against the unauthorized interception or receipt of the Event, the interstate satellite transmission of the Event was electronically coded or scrambled and was not available to or intended for the use of the general public. ECF No. 15-1, Ex. A, Riley Aff. ¶ 6. If a commercial establishment was authorized by Plaintiff to receive the respective Event, the establishment was provided with the electronic decoding equipment and the satellite coordinates necessary to receive the signal or the establishment's cable or satellite provider would be notified to unscramble the reception, depending upon the establishment's equipment and provider. *Id.*

On the night of the Event, Arturo Trevino, an auditor working on Plaintiff's behalf, entered Alamo Card House (the "Establishment"), a commercial establishment located at 10311 Perrin Beitel Road in San Antonio, Texas 72181. ECF No. 15-1, Ex. A-2 ("Trevino Aff.") at 1. According to Trevino, the Establishment was charging a cover charge of $8.00, but would only permit entry to play poker, not to watch the Event, which was being telecast on a large screen television inside. *Id.* An armed security guard outside of the Establishment confirmed that patrons were watching the Event. *Id.* During the Event, Trevino saw approximately 130 patrons inside of the Establishment, which he estimated had a capacity of approximately 200 people. *Id.*

Plaintiff filed this case on September 14, 2021, seeking monetary relief up to $110,000 pursuant to 47 U.S.C. § 605, or, alternatively, up to $60,000 pursuant to 47 U.S.C. § 553. ECF No. 1 at 5. Plaintiff named as Defendants: (1) Alamo Card House, LLC, under which the Establishment operates, and (2) Valerie Howard, an officer and director of Alamo Card House, LLC, who supervised the business activities of the Establishment and had a financial interest in its business operations. ECF No. 15-1, Ex. B (Certificate of Formation of Alamo Card House, LLC, listing Defendant Howard its sole member).

Plaintiff alleges that Defendants failed to contract with or pay a fee to Plaintiff to obtain a proper license or authorization to show the Event at the Establishment. ECF No. 1 at 4. Instead, Plaintiff alleges that Defendants willfully intercepted or received the interstate communication of the Event—or assisted in such actions—and then unlawfully transmitted, divulged, and published said communication—or assisted in unlawfully transmitting, divulging, and publishing said communication. *Id.* Plaintiff alleges that Defendants then showed the Event to patrons of the Establishment without authorization, license, or permission. *Id.* Plaintiff alleges that Defendants pirated Plaintiff's licensed exhibition of the Event and infringed upon Plaintiff's exclusive rights while avoiding proper authorization and payment, and that Defendants acted willfully and with the purpose and intent to secure a commercial advantage and private financial gain. *Id.*

On January 25, 2021, Defendant Howard filed an answer *pro se*, asserting that Alamo Card House had paid for access to the fight on a laptop and showed it on a single screen. ECF No. 10. She further asserted that Alamo Card House, a private, member-based social club, had not profited from the event because it did not charge any additional fees to its members that night and did not earn any additional revenue from alcohol sales because the club "did not allow alcohol on or around the premises." *Id.* at 2.

Now before the Court is Plaintiff's motion for summary judgment. ECF No. 15. Defendant Alamo Card House, LLC ("Alamo") has not answered or otherwise appeared in this action.[2] The Clerk of Court entered default against Alamo on September 22, 2021. ECF No. 20. The Court will consider a motion for default judgment against Alamo after the claim against Howard has been adjudicated in order to avoid inconsistent judgments.

---

[2] An LLC must be represented by an attorney, and cannot be represented by an individual, even if that individual is an executive officer or managing member.

## DISCUSSION

**I.     Summary Judgment Standard**

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56. To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some material element of the non-moving party's claim or defense, or, if the crucial issue is one for which the non-moving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element of the non-movant's claim or defense. *Little v. Liquid Air Corp.*, 952 F.2d 841, 847 (5th Cir. 1992), *on reh'g en* banc, 37 F.3d 1069 (5th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *See Fields v. City of S. Hous.*, 922 F.2d 1183, 1187 (5th Cir. 1991). Any "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment," *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003), and neither will "only a scintilla of evidence" meet the nonmovant's burden. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Rather, the nonmovant must "set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). The Court will not assume "in the absence of any proof . . . that the nonmoving party could or would prove the necessary facts" and will grant summary judgment "in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Little*, 37 F.3d at 1075.

For a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury to return a verdict for the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, the court should review all the evidence in the record, giving credence to the evidence favoring the nonmovant as well as the "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). The Court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment, *id.* at 150, and must review all facts in the light most favorable to the nonmoving party. *First Colony Life Ins. Co. v. Sanford*, 555 F.3d 177, 181 (5th Cir. 2009).

## II.   Analysis

### A.   Liability of Defendant Howard Under 47 U.S.C. § 605

The Act prohibits the "[u]nauthorized interception or receipt or assistance in intercepting or receiving [cable] service" communications. 47 U.S.C. § 553(a). "Cable service" is defined as a "one-way transmission to subscribers of (i) video programming, or (ii) other programming service," and any necessary interactions allowing subscribers access to such service. 47 U.S.C. § 522(6). The Fifth Circuit, as a matter of first impression in *J&J Sports Productions, Inc. v. Mandell Family Ventures, L.L.C.*, joined the majority of circuits in holding the proscriptions of § 553 apply to interceptions or receipts of wire communications, and § 605 applies when radio communications are received or intercepted. 751 F.3d 346, 352 (5th Cir. 2014).

Plaintiff's Complaint seeks damages under § 605 or, alternatively under § 553. However, it expressly states that "[t]he transmission of the Event originated via satellite." ECF No. 1 ¶ 9.

Although it is unclear from Plaintiff's Complaint whether Defendants used internet, cable, or satellite to exhibit the Program, it is plausible—and even likely, given the Establishment was equipped with a satellite dish, *see* ECF No. A-2 (photos)—that Defendants received the Program via satellite. "And when 'there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous.'" *J & J Sports Prods., Inc. v. Enola Invs., L.L.C.*, 795 F. App'x 313, 315 (5th Cir. 2020) (quoting *Justiss Oil Co. v. Kerr-McGee Ref. Corp.*, 75 F.3d 1057, 1062 (5th Cir. 1996)). Thus, the Court will assess liability and damages based on violations alleged under § 605, "as the statute 'does not require identification of the precise means used to accomplish the piracy of a satellite signal.'" *Id.* at 315 (quoting *J&J Sports Prods., Inc. v. Brady*, 672 F. App'x 798, 802–03 (10th Cir. 2016)).

The Communication Act prohibits unauthorized interception or receipt and subsequent dissemination of radio communications so intercepted or received. *See* 47 U.S.C. § 605 (prohibiting not only unauthorized interception or receipt of radio communications but also "[u]nauthorized publication or use of communications" so acquired). Other than securing proper authorization, another exception exists. The prohibition on intercepting/receiving and disseminating (or assistance in so doing) radio communications does not apply if (1) the communications are not encrypted, and (2) a marketing system does not exist allowing individuals the opportunity to obtain authorized access. *See id.* § 605(b). Plaintiff's Complaint alleges that Defendants violated § 605 of the Act "willfully and with the purpose and intent to secure a commercial advantage and private financial gain." ECF No. 1 ¶ 13.

The Communications Act is a strict liability statute. To establish Defendants' liability, Plaintiff must establish by a preponderance of the evidence that (1) the Event was disseminated without authorization in Defendants' Establishment; and (2) the exception to § 605 does not

apply—i.e., that the Event was encrypted, and was available for Defendants' access by authorized means. Any willfulness of Defendants' conduct is relevant only to the issue of damages.

In her answer, Defendant Howard does not dispute that the Event was telecast in the Establishment on September 17, 2018. Instead, she asserts that "we paid for the fight legally on our laptop computer" and that she had "all of the documents to prove everything . . . to show our innocence." ECF No. 10 at 2. Howard has failed to produce any such documents. It is not clear who allegedly paid for such access, nor what kind of access was allegedly purchased. It is possible that Defendant Howard or one of her employees paid for a residential licensing fee in order to view the Event. But the purchase of residential access, even if established, would not immunize Defendants from liability for failing to secure authorization to broadcast the Event at a commercial establishment. *See Joe Hand Promotions, Inc. v. Ol' River Hideaway, LLC*, Noo. 5:15-CV-187-DAE, 2016 WL 590251, at * 3 (W.D. Tex. Feb. 11, 2016) (broadcast of a licensed event at a commercial establishment using a residential license violated § 605); *Garden City Boxing Club, Inc. v. Vinson*, No. 3:03-CV-0700-BD(P), 2003 WL 22077958, at * 2 (N.D. Tex. May 24, 2003) ("The fact that the defendant may have purchased and lawfully received the Lewis-Tyson fight from DirectTV does not immunize her from liability for then broadcasting the event to patrons at her bar without obtaining authorization from the plaintiff, the exclusive licensee.").

Howard has likewise failed to identify the party from whom she allegedly purchased access to the Event. Regardless, "authorization" from anyone other than Plaintiff does not constitute valid permission to show the Event at a commercial establishment. Any and every unauthorized showing of a pay-per-view event is a violation of the Communications Act. *Garden*

*City Boxing Club, Inc. v. Vinson*, No. 3-03-CV-0700-BD(P), 2003 WL 22077958, at *2 ("The fact that defendant may have purchased and lawfully received the Lewis–Tyson fight from DirecTV does not immunize her from liability for then broadcasting the event to patrons at her bar without obtaining authorization from plaintiff, the exclusive licensee."); *Joe Hand Promotions, Inc. v. Texas 411 Corp.*, No. 4:11-cv-02883, ECF No. 31 at 8–9, 9 n.10 (S.D. Tex. Dec. 13, 2012) ("[B]ecause the FCA is a strict liability statute, courts have recognized that *any* access of a protected communication, without the proper authorization is a violation. Defendants' contention that the broadcast was accessed for free via the internet is of no legal import . . . . Even assuming that Defendants did stream the video live from the internet, it is common knowledge that downloading or streaming materials from the internet does not ensure that the downloaded or streamed media is legally obtained."); *Nat'l Satellite Sports, Inc. v. Garcia*, No. Civ.A. 301CV1799D, 2003 WL 21448375, at *1 n.2 (N.D. Tex. June 18, 2003) ("A tape-delayed broadcast without authorization is still a violation of the FCA.").

Based on the undisputed facts, Plaintiff has established by a preponderance of the evidence that the Event was disseminated at Defendant's Establishment without Plaintiff's authorization. The undisputed evidence also indicates that the exception to § 605 does not apply because the Event was encrypted, and was available for Defendants' access by authorized means. *See* ECF No. 15-1, Ex. A, Riley Aff. ¶ 6 (describing encryption and descrambling process); *id.*, Ex. A-3 (Rate Card). Accordingly, the Court concludes that Plaintiff has demonstrated a violation of the Communications Act by a preponderance of the evidence.

Because of the strict liability nature of the Communications Act, officers, directors, members, and managers are held individually liable for the Communications Act violations under the theory of vicarious liability. Courts allow an individual to be held liable for a

company's violation of § 605 if the individual had (1) the right and ability to supervise the unauthorized activities of the establishment in those activities and (2) an obvious and direct financial interest in those activities. *Joe Hand Promotions, Inc. v. 152 Bronx, L.P.*, 11 F. Supp. 3d 747, 753 (S.D. Tex. 2014).

Here, there is no genuine dispute as to whether Defendant Howard can be held individually liable for the violations of the Communications Act. Defendant Howard was the only officer, director, member and/or manager of Defendant Alamo Card House, LLC. *See* ECF No. 15-1, Ex. B. Further, based on the representation in her answer that she had spoken with her management on duty on the day of the Event, ECF No. 10, Defendant Howard had the right and ability to supervise the business activities of the Establishment and had a financial interest in the activities of the Establishment on the date of the Event. *152 Bronx, L.P.*, 11 F. Supp. 3d at 753. Thus, Defendant Howard is individually liable for the violations of the Communications Act.

### B. Damages

Section 605 contains two damage provisions relevant to this case. First, statutory damages are prescribed "for each violation of subsection (a) of this section involved in the action in a sum of not less than $1,000 or more than $10,000, as the court considers just[.]" 47 U.S.C. § 605(e)(3)(C)(i)(II). Second, if violations were "committed willfully and for purposes of direct or indirect commercial advantage or private financial gain," the Court may increase damages "whether actual or statutory, by an amount of not more than $100,000 for each violation of subsection (a) of this section." 47 U.S.C. § 605(e)(3)(C)(ii).

#### 1. Statutory Damages Under Section 605(e)(3)(C)(i)(II)

Plaintiff seeks $10,000 in statutory damages premised on lost licensing fees, and compensation for being deprived of the value, benefits, and profits that may have been realized,

but for Defendants' piracy of the Event. ECF No. 15 ¶ 14. As Plaintiff notes in its briefing, lost licensing fees are a mere baseline in assessing statutory damages. *Id.* at 13–15; *see Entm't by J & J, Inc. v. Al-Waha Enters., Inc.*, 219 F. Supp. 2d 769, 776 (S.D. Tex. 2002) (explaining how damages of mere broadcast cost would not incentivize statute compliance). This Court has previously assessed damages by looking to the number of patrons present during the unauthorized broadcast. *See J&J Sports Prods., Inc. v. Tejada*, No. 5-13-CV-01020-XR, 2014 WL 869218, at *2 (W.D. Tex. Mar. 4, 2014) (assessing baseline statutory damages using number of patrons established by affidavit). This "per-patron" approach is not uncommon in previous § 605 cases. *See, e.g.*, *Al-Waha Enters.*, 219 F. Supp. at 776 (stating "the per-patron approach is an appropriate starting point for calculating damages").

Here, Plaintiff submitted the affidavit of Arturo Trevino, an auditor who was present at the Establishment on the date of the Event, which states there were approximately 130 patrons present and viewing the Event on a large screen. ECF No. 15-1, Ex. A-2, Trevino Aff. at 1. Trevino further observed that the capacity of the Establishment was approximately 200 people. *Id.* According to the submitted "Rate Card" (used to calculate sub-licensing fees based on venue capacity), a commercial establishment with a venue range of 101–200 people would be charged $5,000.00 for the legal right to broadcast the Event. ECF No. 15-1, Ex. A-3.

This Court has previously found trebling the amount a defendant would have been required to pay to legally license the event to be a just assessment of damages. *See, e.g.*, *Tejada*, 2014 WL 869218, at *2 (awarding "three times the amount of the legal sub-license fee"). This multiplier accounts for "money saved by not complying with the law, as well as any profits made from food and drink sales associated with customers who stayed and watched the fight." *Joe Hand Promotions, Inc. v. Garcia*, 546 F. Supp. 2d 383, 386 (W.D. Tex. 2008). In this case, a

trebling of the $5,000.00 fee is $15,000.00. However, the Communications Act limits recovery of statutory damages under § 605 to $10,000.00. 47 U.S.C § 605(D)(6). Thus, the Court awards $10,000.00 in statutory damages.

## 2. Statutory Damages Under Section 605(e)(3)(C)(i)(II)

Section 605 allows for additional statutory damages of not more than $100,000 if the violation is determined to have been "committed willfully and for purposes of direct or indirect commercial advantage or private financial gain." 47 U.S.C. § 605(e)(3)(C)(ii). Section 605 does not require that a defendant *actually* make a profit to merit a determination that a violation was willful. Rather, the language of the statute clearly indicates that a court can impose additional damages if it determines the violation was committed willfully with the *purpose* of financial gain. *Id.*

Given the complexity and limited methods of intercepting closed-circuit broadcasting of pay-per-view events and the low probability that a commercial establishment could intercept such a broadcast by chance, many courts, including this Court, have held such conduct to be willful and for the purposes of direct or indirect commercial advantage or private financial gain. *See Garcia*, 546 F. Supp. 2d at 386 (citing *Al–Waha Enterprises, Inc.*, 219 F. Supp. 2d at 776). As one court observed, "signals do not descramble spontaneously, nor do television sets connect themselves to cable distribution systems*." Time Warner Cable of New York City v. Googies Luncheonette, Inc.*, 77 F. Supp. 2d 485, 490 (S.D.N.Y. 1999).

Because of the absence of any way in which Defendants could have "innocently" accessed the broadcast of the Event, it is apparent that Defendants specifically and willfully acted to illegally intercept the transmissions of the Event for commercial advantage. *See G&G Closed Cir. Events, LLC v. Cisneros*, No. 5:15-CV-302-DAE, 2016 WL 1322485, at *3 (W.D.

Tex. Apr. 1, 2016) ("To divert a residential cable package into a commercial establishment is a deliberate act that evinces willfulness."); *Joe Hand Promotions, Inc. v. Malespin*, No. 99 Civ. 8942 (WHP)(KNF), 2001 U.S. Dist. LEXIS 2037, at *9–10 (S.D.N.Y. Feb. 27, 2001) ("The respective defendants elected not to enter into contracts with plaintiff to obtain the transmission of the Program. Their only means of obtaining the Program, and to avoid paying the legal subscription rate for a commercial establishment, would be: (a) using an illegal descrambler in a satellite receiver; (b) using a pirate cable box; (c) registering their respective commercial establishments as residential sites rather than commercial; and (d) ordering the Program for their respective residences and moving their residential cable boxes to their commercial establishments. The Court finds that employing any one of these means to defraud plaintiff would be evidence of willfulness and would support an award of enhanced damages."). Accordingly, the Court finds that Defendants' violation of 605(a) was "committed willfully and for purposes of direct or indirect commercial advantage."

Courts assessing the amount of damages to award for willful violations in signal piracy actions look to a variety of factors, including the number of patrons, the number and size of televisions, the food and drinks sold to patrons, as well as the cover charge, and whether the event was broadcast in a relatively urban city where the broadcast would have more than a minimal impact. *See Garcia*, 546 F. Supp. 2d at 386; *152 Bronx, L.P.*, 11 F. Supp. 3d at 756 (discussing the factors used to estimate damages for willful violations). Although an award of additional damages should be sufficient to deter such piracy in the future, the Court is mindful that such an award should not be so high as to drive the actor out of business. *See Tejada*, 2014 WL 869218, at *2 n.4; *see also Garcia*, 546 F. Supp. 2d at 386; *Kingvision Pay-Per-View Ltd. v. Lake Alice Bar*, 168 F.3d 347, 350 (9th Cir. 1999) ("Depending on the circumstances, a low five

figure judgment may be a stiff fine that deters, while a high five figure judgment puts a bar out of business. The range in the statutory award might allow for a sanction that deters but does not destroy.").

Here, Plaintiff argues that it is entitled to additional damages based on Defendants' willful conduct because (1) the Event was broadcast on a big-screen television; (2) the Establishment sold food and beverages on the date of the Event; and (3) the Event was broadcast in an urban area. ECF No. 15 ¶ 27. Though Plaintiff seeks $50,000 in additional damages for this willful violation, this amount is excessive in light of the relatively small size of the venue, the relatively few patrons in attendance, and the single screen on which the Event was displayed, especially considering that Defendants could have legally licensed the fight for up to 200 patrons for only $5,000.00. The Court finds damages for a willful violation in the amount of $15,000 appropriate based on the Establishment's approximated 130 patrons on the night of the Event, the broadcast of the Event in an urban area, and any revenue derived from the cover charge and the sale of food and beverages.

## CONCLUSION

Accordingly, Plaintiff's motion for summary judgment (ECF No. 15) is **GRANTED** as to Defendant Valerie Howard. Plaintiff is awarded $25,000.00 in damages. Plaintiff is also entitled to costs and reasonable attorneys' fees under 47 U.S.C. § 605(e)(3)(B)(iii), and intends to file a motion for attorneys' fees within fourteen days after entry of final judgment pursuant to Local Rule CV-7(j). To avoid inconsistent judgments, the Court will consider and rule on Plaintiff's motion for default judgment against Defendant Alamo Card House, LLC before issuing a final judgment under Rule 58 and evaluating any subsequent motion for attorneys' fees.

It is so **ORDERED**.

**SIGNED** this 7th day of December, 2021.

                                              XAVIER RODRIGUEZ
                                              UNITED STATES DISTRICT JUDGE